Robert C. Moest, Of Counsel, SBN 62166
**THE BROWN LAW FIRM, P.C.**
2530 Wilshire Boulevard, Second Floor
Santa Monica, CA 90403
Telephone: (310) 915-6628
Facsimile: (310) 915-9897
Email: RMoest@aol.com

*Counsel for Plaintiff*

[Additional Counsel on Signature Page]

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALEXANDER VERSEN, derivatively on behalf of SONDER HOLDINGS INC., | |
| Plaintiff, | Case No.: |
| v. | |
| FRANCIS DAVIDSON, CHRIS BERRY, DOMINIQUE BOURGAULT, SEAN AGGARWAL, SANJAY BANKER, MICHELLE FRYMIRE, NABEEL HYATT, GILDA PEREZ-ALVARADO, JANICE SEARS, and FRITS DIRK VAN PAASSCHEN, | **DEMAND FOR JURY TRIAL** |
| Defendants, | **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |
| and | |
| SONDER HOLDINGS INC., | |
| Nominal Defendant. | |

Verified Shareholder Derivative Complaint

## INTRODUCTION

Plaintiff Alexander Versen ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of nominal defendant Sonder Holdings Inc. ("Sonder" or the "Company"), files this Verified Shareholder Derivative Complaint against defendants Francis Davidson ("Davidson"), Chris Berry ("Berry"), Dominique Bourgault ("Bourgault"), Sean Aggarwal ("Aggarwal"), Sanjay Banker ("Banker"), Michelle Frymire ("Frymire"), Nabeel Hyatt ("Hyatt"), Gilda Perez-Alvarado ("Perez-Alvarado"), Janice Sears ("Sears"), and Frits Dirk van Paasschen ("van Paasschen") (collectively, the "Individual Defendants," and together with Sonder, "Defendants") for breaches of their fiduciary duties as directors and/or officers of Sonder, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, for violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and against Defendants Davidson, Berry, and Bourgault for contribution under Sections 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Sonder, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by the Individual Defendants from March 16, 2023 through March 15, 2024, inclusive (the "Relevant Period").

2.      Sonder is a hospitality company that aims to revolutionize the industry via tech-enabled service and accommodations being combined into a single, seamless experience. Sonder accomplishes this by leasing and operating a number of accommodation options, such as fully-equipped serviced apartments and hotel rooms. As of December 31, 2022, Sonder had approximately 9,700 units available at over 250 properties, spread throughout 43 cities in 10 countries.

3.      In order to lease properties, Sonder will decorate and furnish the property before allowing guests to book the properties online either directly (through the Company's app or website) or indirectly (through third-party sites such as Airbnb and Expedia). In doing so, the Company is able to provide users with a design-first, technology-based experience.

4.      During the Relevant Period, the Individual Defendants repeatedly misled investors regarding the accuracy of the Company's financial reports, whether there were any material changes in the Company's internal controls, and any disclosure of fraud. Much of these inaccuracies were found in the Company's valuation of operating lease right of use ("ROU") assets and related financials in its financial statements that were filed with the SEC.

5.      For example, on March 16, 2023, the Company filed its annual report on Form 10-K with the SEC (the "2022 10-K") for the fiscal year ended December 31, 2022 (the "2022 Fiscal Year"). In listing the Company's assets, the 2022 10-K revealed the Company's Operating lease ROU assets for the 2022 Fiscal Year were worth $1,209,486,000. In regard to its internal controls, the 2022 10-K stated the following:

> Notwithstanding the identified material weaknesses, management, including our Principal Executive Officer and Principal Financial Officer, *believes the consolidated financial statements included in this Annual Report on Form 10-K fairly represent in all material respects our financial condition, results of operations, and cash flows at and for the periods presented in accordance with U.S. GAAP*.[1]

---

[1] Unless stated otherwise, all emphasis added

Verified Shareholder Derivative Complaint

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Leases

We previously identified a material weakness in our internal control over financial reporting related to the process to capture and record lease agreements timely and accurately. ***Management has concluded that this material weakness in internal control over financial reporting is due to the fact that the Company did not have the adequate resources with the appropriate level of experience and technical expertise to oversee the Company's leasing business processes and related internal controls***.

\* \* \*

*Changes in Internal Control over Financial Reporting*

Other than as discussed above, during the period covered by this report, there has been no change in our internal control over financial reporting that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

6.    The truth did not emerge until March 15, 2024 when the Company issued a press release revealing that the financial statements it had released over the previous year, namely the 2022 10-K and all quarterly reports for the fiscal year ended December 31, 2023 (the "2023 Fiscal Year") were no longer able to be relied upon as the result of "accounting errors related to the valuation and impairment of operating lease ROU assets and related items."

7.    In addition, during its review of the previous filings, the press release revealed that the "***Company expects that the restatements will increase the Company's overall net loss and loss per share in the impacted periods***."

8.    That same day, the Company filed a Notification of Late Filing on Form 12b-25, which would reveal that the pending Form 10-K for the 2023 Fiscal Year would be delayed.

9.    On this news, the price of the Company's stock fell $2.10 per share, or approximately 38.2%, from a close of $5.50 per share on March 17, 2024, to close at $3.40 per share on March 18, 2024.

10.    During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that, with regard to the Company's financial statements issued during the Relevant Period, Defendants knew and/or recklessly disregarded that Sonder had improperly accounted for, *inter alia*, the valuation and impairment of its operating lease ROU assets. As a result of the foregoing, the Company's statements about its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

11.    Additionally, in breach of their fiduciary duties, the Individual Defendants, during the Relevant Period, caused the Company to fail to maintain adequate internal controls.

12.    In light of the Individual Defendants' misconduct—which has subjected the Company, its co-founder and Chief Executive Officer ("CEO"), its former Senior Vice President ("SVP") and Chief Accounting Officer ("CAO"), and its former Chief Financial Officer ("CFO") to a federal securities fraud class action lawsuit pending in the United States District Court for the Northern District of California (the "Securities Class Action"), and which has further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

13.     The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

14.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action and of Defendant Davidson's, Defendant Berry's, and Defendant Bourgault's liability in the Securities Class Action, and of their not being disinterested and/or independent directors, a majority of the Company's Board of Directors ("Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)), Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), Section 10(b) of the Exchange Act (15. U.S.C. § 78j(b)), and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

16.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

17.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

18.     Venue is proper in this District because Sonder's principal executive offices are in this District. In addition, a substantial portion of the transactions and wrongs complained of herein occurred in this District, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

Verified Shareholder Derivative Complaint

**Plaintiff**

19.     Plaintiff is a current shareholder of Sonder. Plaintiff has continuously held Sonder common stock since first purchasing shares on February 25, 2022.

**Nominal Defendant Sonder**

20.     Sonder is a Delaware corporation with its headquarters at 447 Sutter St., Suite 405, #542, San Francisco, California 94108. Sonder's common stock trades on the Nasdaq Global Market ("NASDAQ") under the ticker symbol "SOND."

**Defendant Davidson**

21.     Defendant Davidson has served as the CEO and a director of Sonder since founding Sonder in January 2014. Previously, he also served as the Chair of the Company's Board until December 2024. According to the Schedule 14A the Company filed with the SEC on November 8, 2024 (the "2024 Proxy Statement"), as of November 1, 2024, Defendant Davidson beneficially owned 1,628,678 shares of the Company's common stock, representing 12.9% of the Company's total outstanding common stock.

22.     The 2024 Proxy Statement stated the following about Defendant Davidson:

Francis Davidson has served as our Chief Executive Officer and Chairperson of the Board since the closing of the Business Combination in January 2022. Mr. Davidson co-founded Legacy Sonder and previously served as its Chief Executive Officer and Chairperson since January 2014. Mr. Davidson attended McGill University where he studied Philosophy and Economics. In the summer of 2012, after his first year at McGill University, Mr. Davidson sublet his college apartment to vacationers in Montreal. Over the next two years, he went on to manage the empty apartments of other students in many different cities, ultimately leaving McGill to pursue Sonder full-time with a vision to redefine hospitality by bringing exceptional stays everywhere.

Mr. Davidson brings to the Board his perspective and experience as our current Chief Executive Officer and as the Chief Executive Officer and a co-founder of Legacy Sonder.

**Defendant Berry**

23.     Defendant Berry served as the Company's SVP and CAO from August 2022 until August 2023.

24.     The Schedule 14A the Company filed with the SEC on April 19, 2023 (the "2023 Proxy Statement") stated the following about Defendant Berry:

Chris Berry has served as Sonder's Senior Vice President and Chief Accounting Officer since August 2022 and its Interim Principal Financial Officer from January 2023 through March 2023. Prior to joining Sonder, Mr. Berry served as Vice President, Corporate Controller, and Chief Accounting Officer of Alaska Air Group, Inc. (NYSE: ALK) from February 2017 to April 2022. Mr. Berry joined Alaska Air Group, Inc. in 2005 and served in various roles of increasing responsibility in SEC reporting, accounting operations, and investor relations, including Managing Director of Accounting, Corporate Controller and Principal Accounting Officer from February 2014 to February 2017, Managing Director, Investor Relations from October 2010 to February 2014, and Director, Financial Reporting and Accounting from March 2005 to October 2010. Mr. Berry holds a Bachelor of Business Administration from the University of Louisiana Monroe and a CPA license in Washington State.

**Defendant Bourgault**

25.     Defendant Bourgault served as the Company's CFO from March 2023 until December 2024.

26.     The 2024 Proxy Statement stated the following about Defendant Bourgault:

Dominique Bourgault has served as our Chief Financial Officer since March 2023. Mr. Bourgault joined the Company from Blue Nile, Inc. ("Blue Nile"), a pioneer retailer in online diamonds and fine jewelry, where he served as the Chief Financial Officer from March 2020 to October 2022. Before Blue Nile, Mr. Bourgault was at Expedia Group, Inc. ("Expedia"). He joined Expedia in October 2002 and served in a variety of finance roles of increasing responsibility, including serving as Chief Financial Officer, Retail from November 2019 to March 2020, Interim Head of Division, Brand Expedia Group from July 2019 to October 2019, Chief Financial Officer, Brand Expedia Group, from September 2016 to October 2019, Senior Vice President of Corporate Finance from January 2012 to September 2016, interim CFO of Hotels.com LP from October 2014 to August 2015, Vice President of Finance, Partner Services Group from June 2010 to January 2012, Senior Director, Financial Planning and Analysis Expedia Worldwide from February 2009 to July 2010, and held various financial planning and analysis leadership roles

from 2002 until 2010. Mr. Bourgault holds a Bachelor of Business Administration from HEC Montréal and is a Canadian Chartered Professional Accountant.

**Defendant Aggarwal**

27.    Defendant Aggarwal has served as a Company director since 2022. He also serves as the Chair of the Nominating, Corporate Governance, and Social Responsibility Committee and as a member of the Compensation Committee.

28.    The 2024 Proxy Statement stated the following about Defendant Aggarwal:

Prashant (Sean) Aggarwal has served as one of Sonder's directors since October 2022. Since February 2022, Mr. Aggarwal has served as Co-Founder and Chairman of Borderless AI, an artificial intelligence-powered human resource management platform. Since March 2016, Mr. Aggarwal has served as the Chief Executive Officer of Soar Capital, LLC, where he focuses on investments in early-stage technology companies. Previously, Mr. Aggarwal served as the Chief Financial Officer at Trulia, Inc., an online real estate company. Prior to Trulia, Mr. Aggarwal served as the Vice President of Finance at PayPal, Inc., an online payments company and at eBay Inc. in various finance roles including as Vice President of Finance. Prior to eBay Inc., Mr. Aggarwal served as Director of Finance at Amazon.com, Inc, an e-commerce company. Mr. Aggarwal started his career in investment banking with Merrill Lynch, Pierce, Fenner & Smith Incorporated, a financial services company. Mr. Aggarwal also serves as a member of the board of directors of Arlo Technologies, a home security company, and Lyft, Inc., a transportation company. In addition, in the past five years, he served on the board of directors of Yatra Online, Inc., an online travel company. Mr. Aggarwal holds a Master of Management from Northwestern University, Kellogg School of Management.

Mr. Aggarwal brings to the Board his significant operational experience as an executive with technology companies, and his deep understanding of finance, financial reporting, strategy, operations and risk management.

**Defendant Banker**

29.    Defendant Banker has served as a Company director since January 2023. Previously, he served as the Company's CFO from January 2019 until December 2022, and also as the Company's President from September 2020 until December 2022. He also

serves as a member of the Investment Committee. According to the 2024 Proxy Statement, as of November 1, 2024, Defendant Banker beneficially owned 221,724 total shares of the Company's common stock, which accounted for 1.9% of the Company's total common stock.

30.    The 2024 Proxy Statement stated the following about Defendant Banker:

Sanjay Banker has served as one of Sonder's directors Sonder since January 2023. Mr. Banker has served as the Chief Executive Officer of Private Medical, a leading high-end concierge medicine provider, since June 2024. Mr. Banker previously served as the Company's President and Chief Financial Officer from January 2022 to December 2022, and prior to this, served the Company's predecessor company as Chief Financial Officer since January 2019 and also its President since September 2020. Prior to joining the Company, Mr. Banker was with TPG Growth, an investment firm, from March 2013 to January 2019, where he served most recently as a Partner. From September 2004 to March 2013, he was with Bain Capital, an investment firm, where he served most recently as a Principal. Prior to that, Mr. Banker was with McKinsey & Company, a management consulting firm, from September 1996 to August 2004, where he served most recently as an Engagement Manager. Mr. Banker holds a B.S. in Economics from the Wharton School at the University of Pennsylvania and an M.B.A. from Harvard Business School.

The Board has nominated Mr. Banker because of his perspective and experience as our former President and Chief Financial Officer and his extensive financial background and experience.

**Defendant Frymire**

31.    Defendant Frymire has served as a Company director since 2022. She also serves as the Chair of the Investment Committee and as a member of the Nominating, Corporate Governance, and Social Responsibility Committee. Defendant Frymire previously served on the Audit Committee during the Relevant Period.

32.    The 2024 Proxy Statement stated the following about Defendant Frymire:

Michelle Frymire has served as one of Sonder's directors since September 2022. Ms. Frymire most recently served as Chief Executive Officer of CWT (formerly Carlson Wagonlit Travel), a travel management platform, from May 2021 to May 2022. Ms. Frymire was responsible for leading the company

through and beyond the impact of the pandemic, driving the company's global strategy and overseeing significant investment in the company's product and technology platforms. As a travel management platform, CWT was heavily impacted by the COVID-19 pandemic and with the support of nearly all of its debtholders the company filed a pre-packaged Chapter 11 bankruptcy on November 11, 2021 in the U.S. Bankruptcy Court for the Southern District of Texas. CWT's plan of reorganization was approved by the Bankruptcy Court the following day, on November 12, 2021, and CWT was able to exit Chapter 11 on November 19, 2021. Previous to serving as the CEO, Ms. Frymire was President and CFO and was responsible for driving global business strategy and transformation by building an integrated and collaborative approach to business support and change across CWT. She oversaw the accounting and finance, procurement, real estate, enterprise strategy and planning, human resources and technology functions globally for CWT. Prior to joining CWT in January 2019, Ms. Frymire was Chief Financial Officer for U.S. Risk Insurance Group, LLC, a privately owned specialty lines underwriting manager and wholesale broker, from 2017 to 2019. From 2015 to 2017 she served as Chief Financial Officer for Service King Collision Repair Centers. From 2009 to 2015 she served in a variety of roles for The Service Master Companies, Inc., most recently as Vice President, Corporate FP&A and Strategy. From 2009 to 2013, Ms. Frymire was Chief Financial Officer for TruGreen and from 2005 to 2009, Ms. Frymire was Chief Financial Officer, Vacation Ownership for Starwood Hotels & Resorts Worldwide, Inc. From 1998 to 2005, Ms. Frymire served in a variety of roles for Delta Air Lines, Inc., including Vice President of Finance for Marketing, International, Network and Technology. Prior to this, Ms. Frymire was the Managing Director, Financial Planning, Analysis and Systems for Continental Airlines from 1994 to 1998. Lastly, from 1991 to 1994, Ms. Frymire was Senior Financial Analyst, FP&A with American Airlines Group, Inc. Ms. Frymire serves as a member of the audit committee of Six Flags Entertainment Corporation (NYSE: FUN), an owner and operator of amusement parks, water parks and hotels located in the U.S. and Canada. Ms. Frymire also serves as a director on the board of directors of NCR Atleos (NYSE: NATL), a provider of ATMs and ATM servicing, where she is the chair of the audit committee and a member of the compensation committee. Ms. Frymire previously served on the board of directors and as a member of the audit and nominating & governance committees of Spirit Realty Capital, Inc. (NYSE: SRC), a real estate investment trust, until January 2024 when Spirit Realty Capital, Inc. was acquired. Ms. Frymire received a B.A. in Economics from Austin College and an M.B.A. from the University of Texas at Austin McCombs School of Business.

Ms. Frymire brings to the Board her extensive experience in finance and financial expertise, knowledge and experience in internal and external risk oversight, and executive leadership and management experience in the travel industry.

**Defendant Hyatt**

33.    Defendant Hyatt served as a Company director from 2016 until December 2024.

34.    The 2024 Proxy Statement stated the following about Defendant Mora:

Nabeel Hyatt has served as one of Sonder's directors since the closing of the Business Combination in January 2022 and previously served as one of Legacy Sonder's directors since February 2016. Mr. Hyatt joined Spark Capital, a venture capital firm, in February 2012 and currently serves as a General Partner. He has served on the boards of several privately-held companies. From August 2010 to February 2012, Mr. Hyatt served as the General Manager of Zynga Inc., a social game developer. Prior to this, from March 2007 to August 2010, Mr. Hyatt served as the Chief Executive Officer of Conduit Labs, an early social gaming company he co-founded that was acquired by Zynga. Mr. Hyatt studied Computer Science at Purdue University and holds a B.A. in Design from the Maryland Institute College of Art.

Mr. Hyatt brings to the Board his operational experience in the technology industry and extensive knowledge of high-growth companies.

**Defendant Perez-Alvarado**

35.    Defendant Perez-Alvarado served as a Company director from 2021 until October 2023.

36.    The 2023 Proxy Statement stated the following about Defendant Perez-Alvarado:

Gilda Perez-Alvarado has served as one of Sonder's directors since the closing of the Business Combination in January 2022 and previously served as one of Legacy Sonder's directors since September 2021. Ms. Perez-Alvarado currently serves as the Global Chief Executive Officer of JLL for the Hotels & Hospitality industry, a real estate advisor, where she has worked since October 2004. She concurrently leads the group's Global Hotel Desk, a

specialized team of cross-border investment sales professionals based in the Middle East, Asia Pacific, the Americas and Europe. Prior to that, from May 2002 to September 2004, Ms. Perez-Alvarado worked for the Hospitality and Leisure advisory practice of PricewaterhouseCoopers, a professional services firm. She serves on the board of directors of Blackstone Mortgage Trust (NYSE: BXMT), a real estate investment trust. Ms. Perez-Alvarado holds a B.S. in Hotel Administration from Cornell University and an M.B.A. from Instituto de Empresa (IE Business School).

The Board has nominated Ms. Perez-Alvarado because of her global experience in the real estate and hospitality industries and her extensive knowledge of hotel real estate finance.

### Defendant Sears

37. Defendant Sears has served as a Company director since 2021 and as the Chairperson of the Board since January 2025. Previously, she served as the Lead Independent Director. She also serves as a Chair of the Audit Committee and as a member of the Compensation Committee.

38. The 2024 Proxy Statement stated the following about Defendant Sears:

Janice L. Sears has served as one of Sonder's directors since the closing of the Business Combination in January 2022 and as Lead Independent Director since December 2023, and previously served as one of Legacy Sonder's directors since August 2021. From April 1988 to January 2009, Ms. Sears served in a variety of positions at Banc of America Securities, an investment bank, including as Managing Director, Western Region Head in the Real Estate, Gaming & Lodging Investment Banking Group. She concurrently served as the San Francisco Market President for Bank of America, a financial services company. Prior to this, Ms. Sears was a Real Estate Economist at both Chemical Bank and Citicorp. She serves on the board of directors as a member of the Compensation Committee and Audit Committee at Invitation Homes Inc. (NYSE: INVH), a single-family home rental business. Ms. Sears also serves on the board of directors as Audit Committee Chair and a member of the Compensation Committee at IQHQ, Inc., a life sciences real estate investment trust. Ms. Sears previously served on the board and as Audit Committee Chair of both Essex Property Trust Inc. (NYSE: ESS), a multi-family real estate investment trust, and BioMed Realty Trust (acquired by Blackstone, 2016), a life sciences real estate investment trust. She has also served on the board of several non-profit organizations and private companies,

including Board Chair of The Swig Company, an owner of office buildings in New York and California. Ms. Sears holds a B.A. in both Economics and Marketing from the University of Delaware.

The Board has nominated Ms. Sears because of her extensive financial background and experience working in the commercial real estate industry.

**Defendant van Paasschen**

39.    Defendant van Paasschen has served as a Company director since 2020. He also serves as a member of the Audit Committee and the Investment Committee.

40.    The 2024 Proxy Statement stated the following about Defendant van Paasschen:

Frits Dirk van Paasschen has served as one of Sonder's directors since the closing of the Business Combination in January 2022 and previously served as one of Legacy Sonder's directors since February 2020. From September 2007 to February 2015, Mr. van Paasschen served as the President and Chief Executive Officer of Starwood Hotels and Resorts Worldwide, LLC, a hotel company acquired by Marriott International, Inc. Prior to joining Starwood, he was the President and Chief Executive Officer of Coors Brewing Company from February 2005 to September 2007. He serves on the board of directors at dsm-firmenich, a Netherlands-based science company specializing in nutrition and health, and Williams-Sonoma, Inc., a consumer retail company specializing in kitchen-wares and home furnishings. Mr. van Paasschen also serves on the board of directors of Amadeus, a provider of digital services to the travel industry. He also serves on the board of directors of two private companies and is an advisor to a global investment firm. Mr. van Paasschen holds a B.A. in Economics and Biology from Amherst College and an M.B.A. from Harvard Business School.

The Board has nominated Mr. van Paasschen because of his extensive knowledge of the real estate and hospitality industries and his international experience.

**FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**

41.    By reason of their positions as officers, directors, and/or fiduciaries of Sonder and because of their ability to control the business and corporate affairs of Sonder, the Individual Defendants owed Sonder and its shareholders fiduciary obligations of trust,

loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Sonder in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Sonder and its shareholders so as to benefit all shareholders equally.

42.    Each director and officer of the Company owes to Sonder and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

43.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of Sonder, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

44.    To discharge their duties, the officers and directors of Sonder were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

45.    Each Individual Defendant, by virtue of their position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Sonder, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised the Company's Board at all relevant times.

46.    As senior executive officers and/or directors of a publicly-traded company

whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

47.    To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Sonder were required to, among other things:

(a)    ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, California, and the United States, and pursuant to Sonder's corporate governance and applicable codes of conduct and/or ethics;

(b)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    remain informed as to how Sonder conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)    establish and maintain systematic and accurate records and reports of

the business and internal affairs of Sonder and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)    maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Sonder's operations would comply with all applicable laws and Sonder's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)    exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)    refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)    examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

48.    Each of the Individual Defendants further owed to Sonder and the shareholders the duty of loyalty requiring that each favor Sonder's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

49.    At all times relevant hereto, the Individual Defendants were the agents of each other and of Sonder and were at all times acting within the course and scope of such agency.

50.    Because of their advisory, executive, managerial, directorial, and controlling positions with Sonder, each of the Individual Defendants had access to adverse, nonpublic information about the Company.

Verified Shareholder Derivative Complaint

51.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Sonder.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

52.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

53.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects, and internal controls; and (iii) artificially inflate the Company's stock price.

54.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Sonder was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

55.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

56.     At all relevant times hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Sonder and was at all times acting within the course and scope of such agency.

## SONDER'S CODE OF CONDUCT

57.     Sonder's Code of Business Conduct and Ethics (the "Code of Conduct") represents that it "applies to all individuals working for Sonder, working at Sonder, or representing Sonder," specifically noting that the Code of Conduct was "specifically written for Sonder's employees, officers and directors."

58.     The Code of Conduct states that the Company is "committed to building a healthy, ethical, and compliant company."

59.     In the section "Act Ethically and Honestly," the Code of Conduct states:

As a Sonder employee, you're expected to complete your work efficiently, responsibly, and in an acceptable manner. All information you provide during or related to your employment should be complete and accurate to the best of your knowledge. Maintaining the accuracy of our reporting and recordkeeping is a responsibility we all share, and all of our transactions must be correct and properly recorded. See "Do the Right Thing -- Act with Honesty and Integrity - Accurate Books, Records and Reports" for more information on the importance of honesty and accuracy in Sonder's financial reporting.

Dishonesty, deceit, or theft will not be tolerated, including embezzlement, falsifying company documents, and accepting kickbacks in any form. This also includes abusing employment benefits like time off, insurance, facilities, discounts, or other benefits Sonder offers.

60.    In the section "Maintain Confidentiality," the Code of Conduct states, in relevant part:

> Confidential information and intellectual property represent the outcome of significant company investment and years of hard work. In carrying out Sonder's business, you may learn confidential or proprietary information about Sonder, as well as its customers, suppliers and/or business partners. Confidential information of Sonder and other companies may not be shared with a third party without a legitimate business reason and proper authorization, and you must use good judgment when determining what confidential information may be shared internally, and with whom.
>
> When in receipt of confidential information of a third party, you must always abide by any confidentiality and/or use restrictions imposed by the disclosing party, and limit dissemination of the confidential information both inside and outside the Company to people who need to know the information for business purposes and who are bound by similar obligations of confidentiality, unless disclosure is authorized or legally mandated. Your obligation to protect the confidential information of Sonder and of individuals and companies with which we do business continues even if your employment with Sonder ends.
>
> You are responsible for understanding and complying with the law and any signed agreements regarding the possession or distribution of non-public information. Please contact the Compliance Officer if you have any questions about whether information is confidential.

61.    In the section "Act with Honesty and Integrity – Accurate Books, Records and Reports" the Code of Conduct states, in relevant part:

> We have a responsibility to provide full and accurate information in our public disclosures about our financial condition and results of operations. Sonder's books, records and reports are only as accurate as the data from which they are derived. All employees might, at some point, contribute to the accuracy of information (including financial information) maintained by Sonder or submitted to our regulators.
>
> You are responsible for the accurate and complete reporting of any information (including financial information) within your respective areas. You should never falsify or distort any information or document related to your work at Sonder, including but not limited to: ● expense reports; ● purchase orders; ● benefits claims; ● invoices; ● entries in financial books

and records; and ● quality and safety reports.

\* \* \*

Inaccuracies in our financial information may undermine the confidence of our customers, investors, and owners and harm our reputation. Further, inaccurate financial records could result in Sonder failing to satisfy legal, regulatory, or fiduciary obligations and cast doubt on our integrity and honesty. You must:

- maintain all of Sonder's books, records, accounts and financial statements in reasonable detail, and reflect the matters to which they relate accurately, fairly and completely;

- ensure that all books, records, accounts and financial statements conform both to applicable legal requirements and to Sonder's system of internal controls; and

- carefully and properly account for all of Sonder's assets.

62.     In the section "Uphold the Law" the Code of Conduct states, in relevant part:

Sonder is committed to complying with the laws of the countries in which we operate. Employees have an obligation to be knowledgeable about the laws, rules, and regulations that apply to their areas of responsibility and the locations where we operate. You must understand and comply with all laws, rules and regulations that apply to your specific role, and are responsible for preventing violations of the law and for speaking up if you see possible violations.

\* \* \*

- Keeping the Audit Committee Informed. The Audit Committee of the Board (the "Audit Committee") plays an important role in ensuring the integrity of the Company's public reports. See below under "Follow our Code -- Reporting of Any Illegal or Unethical Behavior" for additional information.

- Maintaining and Managing Records. Sonder is required by local, state, federal, foreign and other applicable laws, rules and regulations to

retain certain records and to follow specific guidelines in managing its records. Records include all recorded information, regardless of medium or characteristics. Civil and criminal penalties for failure to comply with such guidelines can be severe for employees, agents, contractors and for Sonder. Additionally, you are required to cooperate with any request made by the Compliance Officer to preserve or produce any Sonder-issued devices, computers, hardware, cell phones and any documents, records, information, or other media on any such Sonder-issued devices, computers, hardware, and cell phones. See above under "Do the Right Thing -- Act with Honesty and Integrity - Accurate Books, Records and Reports".

63.    In the section, "Avoid Conflicts of Interest," the Code of Conduct states, in relevant part:

A "conflict of interest" exists when a person's private interest interferes, or appears to interfere, with Sonder's interests. You should avoid actual or potential conflicts of interest that might adversely affect your judgment, objectivity or loyalty to Sonder. Although you're free to engage in meaningful activities outside of your job, any potential conflict of interest must be disclosed to your manager or HR Business Partner immediately upon discovery of the conflict.

64.    The Code of Conduct discusses reporting violations in the section "Reporting of Any Illegal or Unethical Behavior," stating, in relevant part:

Situations that may involve a violation of ethics, laws or this Code may not always be clear and may require difficult judgment calls. You are encouraged to seek guidance from your manager, the Compliance Officer or Human Resources when in doubt about the best course of action to take in a particular situation. In most instances, you should report any concerns or questions about a violation of laws, rules, regulations or this Code to your supervisors/managers or Sonder's General Counsel or, in the case of accounting, internal accounting controls or auditing matters, the Audit Committee.

If you know of or suspect a violation of this Code, or of applicable laws and regulations (including complaints or concerns about accounting, internal accounting controls or auditing matters), or if you have concerns about a situation that you believe does not reflect Sonder's culture and values, you must report it immediately to your manager, the Compliance Officer or

Verified Shareholder Derivative Complaint

Human Resources. You may also report concerns anonymously (i) by calling
the Company's confidential independent secure reporting hotline at 1-833-
411- 1180 or (ii) by accessing the Company's confidential independent secure
web portal at http://sonder.ethicspoint.com.

\* \* \*

The Audit Committee plays an important role in ensuring the integrity of
Sonder's public reports. If you believe that questionable accounting or
auditing conduct or practices have occurred or are occurring, you should
notify the Audit Committee. In particular, you should promptly bring to the
attention of the Audit Committee any information of which you become aware
concerning: ● the accuracy of material disclosures made by Sonder in its
public filings; ● material weaknesses or significant deficiencies in internal
control over financial reporting; ● any evidence of fraud that involves an
employee who has a significant role in the Sonder's financial reporting,
disclosures or internal controls or procedures; or ● any evidence of a material
violation of the policies in this Code regarding financial reporting.

65.    In the section "Waivers and Amendments," the Code of Conduct states:

We reserve the right to amend this Code at any time, for any reason, subject
to applicable laws, rules and regulations.

Any amendment or waiver of any provision of this Code must be approved in
writing by the Sonder Board of Directors or, if appropriate, its delegate(s),
and promptly disclosed pursuant to applicable laws and regulations. Any
waiver or modification of this Code for the principal executive officer,
principal financial officer, principal accounting officer, controller, or any
other persons performing similar functions in the company will be promptly
disclosed to stockholders if and as required by applicable law or the rules of
the stock exchange on which Sonder's securities are listed.

66.    In violation of the Code of Conduct, the Individual Defendants conducted
little, if any, oversight of the Company's engagement in the Individual Defendants' scheme
to issue materially false and misleading statements to the public and to facilitate and
disguise the Individual Defendants' violations of law, including breaches of fiduciary duty,
gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment,
violations of the Exchange Act, and the aiding and abetting thereof. Also, in violation of

the Code of Conduct, the Individual Defendants failed to maintain internal controls, failed to obtain waivers and/or failed to disclose obtained waivers of violating the Code of Conduct, and failed to comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Codes of Conduct.

## SONDER'S AUDIT COMMITTEE CHARTER

67.    Sonder also maintains a Charter of the Audit Committee of the Board of Directors (the "Audit Committee Charter") which governs the Audit Committee's roles and responsibilities. The Audit Committee Charter states the following regarding the purpose of the Audit Committee:

> The purpose of the Committee shall be to assist the Board in its oversight of: 1. the quality and integrity of the accounting and financial reporting processes and internal controls of the Company; 2. the Company's financial statement audits and the integrity of the Company's financial statements; 3. the Company's compliance with applicable law (including U.S. federal securities laws and other legal and regulatory requirements) applicable to the financial statement and accounting and financial reporting processes; 4. the Company's compliance with ethical standards adopted by the Company; 5. the Company's systems of disclosure controls and procedures; 6. the qualifications, independence and performance of the Company's independent auditors; 7. the implementation and performance of the Company's internal audit function; 8. disclosures related to environmental, social and governance ("ESG") matters; and 9. the Company's enterprise-wide risk assessment, focusing on material risks.

68.    Under the heading "Responsibilities," in a subsection titled "Appoint and Oversee Independent Auditor; Approve Audit and Non-Audit Services," the Audit Committee Charter states the following, in relevant part:

> The Committee will be directly responsible for appointing, compensating, retaining, evaluating and overseeing an independent registered public accounting firm to act as the Company's independent auditor for the purpose of auditing the Company's financial statements, books, records, accounts and internal control over financial reporting, and, where appropriate, replacing the independent auditor. The Committee shall also appoint, retain, compensate, oversee and, where appropriate, replace any other registered public

accounting firm engaged for the purpose of preparing or issuing an audit report or performing other audit, review or attest services for the Company. Each such independent registered public accounting firm shall report directly to the Committee.

69.     Under the same heading, in a subsection titled "Review of Internal Controls and Integrity of Financial Statements" the Audit Committee Charter states the following, in relevant part:

The Committee shall meet with management, the internal audit department, if applicable, and the Company's independent auditor to review and discuss the Company's internal controls and the integrity of the Company's audited financial statements. Included in this process shall be review of:

a.  the scope and timing of the annual audit of the Company's financial statements;

b.  the Company's annual audited and quarterly unaudited financial statements and annual and quarterly reports on Form 10-K and Form 10-Q, including the disclosures in "Management's Discussion and Analysis of Financial Condition and Results of Operations"; the Committee shall make a recommendation to the Board as to whether the audited financial statements and "Management's Discussion and Analysis of Financial Condition and Results of Operations" should be included in the Company's Form 10-K for filing with the SEC;

c.  the results of the independent audit and the quarterly reviews, and the independent auditor's opinion on the audited financial statements;

d.  the quality and adequacy of the Company's internal controls, and discussion with management and the independent auditor with regard to any significant deficiencies or material weaknesses in the design or operation of, and any material changes in, the Company's internal controls;

e.  the Company's disclosure controls and procedures, as well as the quarterly assessments of such controls and procedures by the Chief Executive Officer and Chief Financial Officer;

f.  any major issues regarding accounting principles and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles, and major issues as to the

adequacy of the Company's internal controls and any special audit steps
adopted in light of material control deficiencies;

g. any analyses prepared by management or the independent auditor setting
forth significant financial reporting issues and judgments made in
connection with the preparation of the financial statements, including
analyses of the effects of alternative GAAP methods on the financial
statements;

h. the effect of regulatory and accounting initiatives, as well as off-balance
sheet structures, on the financial statements of the Company; and

i. any audit problems or difficulties the independent auditor encountered in
the course of its audit work, including any restrictions on the scope of the
independent auditor's activities or on access to requested information, and
any significant disagreements with management.

70. Under the same heading, in a subsection titled "Review of Financial
Information Presentation, Earnings Press Releases and Guidance" the Audit Committee
Charter states the following:

The Committee shall periodically discuss with management the Company's
procedures with respect to the presentation of the Company's financial
information (paying attention to any use of "pro forma" or "adjusted" non-
GAAP information, among other things) and review earnings press releases
and related materials (if any), earnings guidance provided to analysts and
rating agencies and financial information provided to the public, analysts and
ratings agencies.

71. Under the same heading, in a subsection titled "Internal Audit Function" the
Audit Committee Charter states the following:

The Committee shall, as applicable, oversee the design, implementation and
performance of the Company's internal audit function, including by:

a. reviewing and approving the charter of the Company's internal audit
function and any amendments;

b. reviewing the responsibilities, functions, qualifications, budget,
performance, objectivity, and the scope and results of internal audits;

c. reviewing and approving the annual plan and scope of work of the
Company's internal audit function, including its responsibilities and

staffing;

    d.   approving the hiring, promotion, demotion or termination of the person in charge of the Company's internal audit function;

    e.   reviewing the results of the internal audit program, including significant issues in internal audit reports and responses by management; and

    f.   monitoring that the Company maintains an effective internal audit function and overseeing the internal auditors (or other personnel responsible for the Internal Audit function)[, who will report directly to the Committee].

72.    In violation of the Audit Committee Charter, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, gross mismanagement, abuse of control, waste of corporate assets, and violations of the Exchange Act. Moreover, in violation of the Audit Committee Charter, the Individual Defendants failed to maintain the accuracy of the Company records and reports, comply with laws and regulations, act in good faith and diligence without misstating, misrepresenting, or omitting material facts, and properly report violations of the Audit Committee Charter.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

73.    Sonder is a hospitality company that aims to revolutionize the industry via tech-enabled service and accommodations being combined into a single, seamless experience. This is accomplished by working with real estate owners to lease and operate a number of accommodation options, such as fully-equipped serviced apartments and hotel rooms. As of December 31, 2022, Sonder had approximately 9,700 units available at over 250 properties, spread throughout 43 cities in 10 countries.

74.     Prior to leasing its properties, Sonder will decorate and furnish the property before allowing guests to book the properties online either directly (through the Company's app or website) or indirectly (through third-party sites such as Airbnb and Expedia). In doing so, the Company is able to provide users with a design-first, technology-based experience.

75.     There are two Generally Accepted Accounting Principles ("GAAP") that apply to Sonder's business. The first, Accounting Standards Codification ("ASC") 842 requires all lessees to recognize all leases, with certain exceptions, on its balance sheets. ASC also eliminates real estate-specific provisions and modifies certain aspects of a lessor's accounting. This standard requires lessees to recognizes ROU assets and lease liabilities on their balance sheets for most leases, bringing greater transparency to the financial leverage and capital employed by companies.

76.     In essence, ASC 842 eliminates the classification of leases as either operating leases of finance leases, and instead requiring lessees recognize a ROU asset and lease liability and virtually all lease contracts. In so doing, the standard may provide investors with a more accurate picture of a company's leasing activities and obligations.

77.     The other GAAP is ASC 360, provides guidelines on how to account long-lived assets such as buildings, equipment and land. It also governs how businesses should account for acquisitions, depreciation, impairment, and disposal of these assets. ASC 360 also dictates that impairment occurs when the current fair value of an asset is different from its carrying value.

78.     Both ASC 842 and ASC 360 are simple to understand, interpret, and apply, especially for accounting professionals.

## FALSE AND MISLEADING STATEMENTS

### March 16, 2023 Form 10-K

79.     On March 16, 2023, the Company filed the 2022 10-K with the SEC, announcing its financial results for the fourth quarter and full-year of the 2022 Fiscal Year.

Verified Shareholder Derivative Complaint

The 2022 10-K was signed by Defendants Davidson, Berry, Hyatt, Paasschen, Sears, Perez-Alvarado, Frymire, Aggarwal, and Banker and attached certifications pursuant to Rules 13a-14(a) and 15(d)-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Davidson and Berry attesting to the accuracy of the 2022 10-K and that "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the [Company] as of, and for, the periods presented in this report."

80.    The 2022 10-K included the Company's consolidated balance sheets for the 2022 Fiscal Year and the fiscal year ended December 31, 2021 (the "2021 Fiscal Year"). In listing the Company's assets on the balance sheet, the 2022 10-K lists the "Operating lease right-of-use ("ROU") assets" at $1,209,486,000 for the 2022 Fiscal Year, with no number given for the 2021 Fiscal Year. In full, the balance sheet in the 2022 10-K showed the following assets (in thousands):

| | 2022 | 2021 |
|---|---|---|
| **Assets** | | |
| Current assets: | | |
| Cash | $    246,624 | $    69,726 |
| Restricted cash | 42,562 | 215 |
| counts receivable, net of allowance of $972 and $4,127 at December 31, 2022 and 2021, respectively | 5,613 | 4,638 |
| Prepaid rent | — | 2,957 |
| Prepaid expenses | 8,066 | 5,029 |
| Other current assets | 10,065 | 16,416 |
| Total current assets | 312,930 | 98,981 |
| Property and equipment, net | 34,926 | 27,461 |
| Operating lease right-of-use ("ROU") assets | 1,209,486 | — |
| Other non-current assets | 16,270 | 22,037 |
| Total assets | $    1,573,612 | $    148,479 |

Verified Shareholder Derivative Complaint

81.     A note in the 2022 10-K later broke down how the Company accounted for its

leases. The note stated:

> Operating lease ROU assets are included within operating lease right- of-use assets in the consolidated balance sheets. The corresponding operating lease liabilities are included within current operating lease liabilities and non-current operating lease liabilities in the consolidated balance sheets. ROU assets represent the Company's right to use an underlying asset for the lease term and lease liabilities represent the Company's obligation to make lease payments arising from the lease.

> The adoption of ASC 842 had a material impact on the Company's consolidated financial statements. On January 1, 2022, the Company recognized $1.0 billion in operating lease ROU assets, $1.1 billion of operating lease liabilities, and a $66.1 million reduction to deferred rent, which was recorded as a reduction to the ROU asset measured on the adoption date. The standard did not materially impact the Company's consolidated statement of operations and comprehensive loss or consolidated statement of cash flows.

> Lease expense for fixed operating lease payments is recognized on a straight-line basis over the lease term. The Company's lease terms may include options to extend or terminate the lease when it is reasonably certain that it will exercise that option.

82.     The note then broke down the components of the Company's operating leases, with the tables showing (in thousands):

| | Year ended December 31, |
| --- | --- |
| | 2022 |
| Operating lease cost | $ 268,810 |
| Short-term lease cost | 3,203 |

Verified Shareholder Derivative Complaint

| | |
|---|---|
| Variable lease cost | (2,582) |
| Total operating lease cost | $ 269,431 |

Supplemental information related to operating leases was as follows (in thousands):

| | Year ended December 31, 2022 |
|---|---|
| Cash payments for operating leases | $ 218,434 |
| New operating lease ROU assets obtained in exchange for operating lease liabilities | $ 356,157 |

83.    At no point however, did the 2022 10-K report any impairment charges.

84.    In addition, the 2022 10-K discussed the Company's internal controls and material weaknesses. In regards to material weaknesses, the 2022 10-K states:

> Notwithstanding the identified material weaknesses, management, including our Principal Executive Officer and Principal Financial Officer, ***believes the consolidated financial statements included in this Annual Report on Form 10-K fairly represent in all material respects our financial condition, results of operations, and cash flows at and for the periods presented in accordance with U.S. GAAP***.

> Leases

> We previously identified a material weakness in our internal control over financial reporting related to the process to capture and record lease agreements timely and accurately. ***Management has concluded that this material weakness in internal control over financial reporting is due to the fact that the Company did not have the adequate resources with the appropriate level of experience and technical expertise to oversee the Company's leasing business processes and related internal controls***.

85.    Additionally, in regards to any changes in internal controls over financial reporting, the 2022 10-K stated that "[o]ther than as discussed above, during the period covered by this report, there has been no change in our internal control over financial reporting that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting."

Verified Shareholder Derivative Complaint

*April 19, 2023 Proxy Statement*

86.     On April 19, 2023, the Company filed the 2023 Proxy Statement with the SEC. Defendants Davidson, Aggarwal, Banker, Frymire, Hyatt, Perez-Alvarado, Sears, and van Paasschen solicited the 2023 Proxy Statement, filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

87.     The 2023 Proxy Statement called for Company shareholders to vote to, *inter alia*: (1) re-elect Defendants Perez-Alvarado and Frymire to the Board for a three-year term; and (2) ratify the selection of Deloitte & Touche LLP as the Company's independent registered public accounting firm for the 2023 Fiscal Year.

88.     With respect to the Company's Code of Conduct, the 2023 Proxy Statement stated:

> The Board has adopted a Code of Business Conduct and Ethics that applies to all employees and directors, including our principal executive officer, principal financial officer, principal accounting officer, other executive officers, and other senior financial personnel. A copy of our Code of Business Conduct and Ethics is available in the Investor Relations section of our website at investors.sonder.com under "Corporate Governance—Document & Charters—Governance Documents." Information on or accessible through our website is not incorporated by reference in this Proxy Statement. If we make any substantive amendment to a provision of our Code of Business Conduct and Ethics that applies to, or grant any waiver from a provision of our Code of Business Conduct and Ethics to, our principal executive officer, principal financial officer, principal accounting officer or controller, or persons performing similar functions, we will promptly disclose the date and nature of the amendment or waiver (including the name of the person to whom the waiver was granted) on our website in accordance with the requirements of Item 5.05 of Form 8-K.

89.     Regarding the "Role of the Board in Risk Oversight," the 2023 Proxy Statement stated the following, in relevant part:

> Risk is inherent with every business, and we face a number of risks, including strategic, financial, business and operational, legal and compliance and reputational. We have designed and implemented processes to manage risk in our operations. Management is responsible for the day-to-day management of

risks the Company faces, while one of the Board's key functions is informed oversight of the Company's risk management process.

The Board believes that its current leadership structure facilitates its risk oversight responsibilities. The Board does not have a standing risk management committee, but rather administers this oversight function directly through the Board as a whole, as well as through the various standing Board committees that address risks inherent in their respective areas of oversight. For example, the Board acts as the ultimate decision-making body of the Company and advises and oversees management, who are responsible for the day-to-day operations and management of the Company. The Board believes the majority-independent Board and independent Board committees provide a well-functioning and effective balance to an experienced Chairperson. The Audit Committee oversees the Company's accounting and financial reporting processes, including our systems of disclosure controls and procedures and internal control over financial reporting, the performance of our internal audit function, and financial statement audits, monitors compliance with legal and regulatory requirements, and reviews the Company's policies and practices with respect to risk assessment and risk management. The Governance Committee monitors the effectiveness of, and oversees compliance with, our corporate governance guidelines and policies and assesses the overall operation and functioning of the Board and its committees. The Compensation Committee assesses and monitors whether any of our compensation programs, policies and practices has the potential to encourage excessive risk-taking.

90. Defendants Davidson, Aggarwal, Banker, Frymire, Hyatt, Perez-Alvarado, Sears, and van Paasschen caused the 2023 Proxy Statement to be false and misleading by failing to disclose, *inter alia*, that, with regard to the Company's financial statements issued during the Relevant Period, Defendants knew and/or recklessly disregarded that Sonder had improperly accounted for, *inter alia*, the valuation and impairment of its operating lease ROU assets. As a result of the foregoing, the Company's statements about its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

91. The 2023 Proxy Statement was also false and misleading because, despite assertions to the contrary, the Company's Code of Conduct and the Audit Committee Charter were not followed, as evidenced by the Individual Defendants: (1) making and/or

causing the Company to make the numerous false and misleading statements and omissions alleged herein; and (2) failing to report violations of the Code of Conduct. Further, the 2023 Proxy Statement was materially false and misleading because, despite assertions to the contrary, the Board was not adequately performing its risk oversight functions.

92.    Defendants Davidson, Aggarwal, Banker, Frymire, Hyatt, Perez-Alvarado, Sears, and van Paasschen causing the 2023 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to: (1) re-elect Defendants Perez-Alvarado and Frymire to the Board for a three-year term, thereby allowing them to continue breaching their fiduciary duties to the Company; and (2) ratify the selection of Deloitte & Touche LLP as the Company's independent registered public accounting firm for 2023 Fiscal Year.

### May 10, 2023 Form 10-Q

93.    On May 10, 2023, the Company filed the its quarterly report on Form 10-Q with the SEC for the first quarter of the 2023 Fiscal Year (the "Q1 2023 10-Q"). The Q1 2023 10-Q was signed by Defendant Berry and attached SOX certifications signed by Defendants Davidson and Bourgault attesting to the accuracy of the Q1 2023 10-Q and that "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the [Company] as of, and for, the periods presented in this report."

94.    The Q1 2023 10-Q contained a consolidated balance sheet that showed the value of the Company's "Operating lease right-of-use ("ROU") assets as $1,201,007,000 for the first quarter of the 2023 Fiscal Year. In full, the balance sheet in the Q1 2023 10-Q showed the following assets and liabilities (in thousands):

|  | March 31, 2023 | December 31, 2022 |
|---|---|---|
| **Assets** | | |
| Current assets: | | |
| Cash and cash equivalents | $        217,968 | $        246,624 |
| Restricted cash | 28,436 | 42,562 |
| Accounts receivable, net of allowance of $1,346 and $972 at March 31, 2023 and December 31, 2022, respectively | 6,990 | 5,613 |
| Prepaid expenses | 5,128 | 8,066 |
| Other current assets | 12,708 | 10,065 |
| Total current assets | 271,230 | 312,930 |
| Property and equipment, net | 35,432 | 34,926 |
| Operating lease right-of-use ("ROU") assets | 1,201,007 | 1,209,486 |
| Other non-current assets | 13,791 | 16,270 |
| Total assets | $     1,521,460 | $     1,573,612 |
| | | |
| **Liabilities and stockholders' deficit** | | |
| Current liabilities: | | |
| Accounts payable | $        14,093 | $        16,082 |
| Accrued liabilities | 18,230 | 20,131 |
| Taxes payable | 16,497 | 14,418 |
| Deferred revenue | 58,424 | 41,664 |
| Current operating lease liabilities | 172,422 | 158,346 |
| Total current liabilities | 279,666 | 250,641 |
| Non-current operating lease liabilities | 1,156,913 | 1,166,538 |
| Long-term debt, net | 179,665 | 172,950 |
| Other non-current liabilities | 2,043 | 3,430 |
| Total liabilities | 1,618,287 | 1,593,559 |

95.    A note in the Q1 2023 10-Q later broke down how the Company accounted for its leases. The note stated:

Operating lease ROU assets are included within operating lease right- of-use assets in the consolidated balance sheets. The corresponding operating lease liabilities are included within current operating lease liabilities and non-current operating lease liabilities in the consolidated balance sheets. ROU assets represent the Company's right to use an underlying asset for the lease term and lease liabilities represent the Company's obligation to make lease payments arising from the lease.

Lease expense for fixed operating lease payments is recognized on a straight-line basis over the lease term. The Company's lease terms may include options to extend or terminate the lease when it is reasonably certain that it will exercise that option.

96.    The note then broke down the components of the Company's operating leases, with the tables showing (in thousands):

| | Three months ended March 31, | |
| --- | --- | --- |
| | 2023 | 2022 |
| Operating lease cost | $ 75,259 | $ 62,947 |
| Short-term lease cost | 632 | 2 |
| Variable lease cost | 1,501 | 643 |
| Total operating lease cost | $ 77,392 | $ 63,592 |

Supplemental information related to operating leases was as follows (in thousands):

| | Three months ended March 31, | |
| --- | --- | --- |
| | 2023 | 2022 |
| Cash payments for operating leases | $ 68,215 | $ 49,765 |
| New operating lease ROU assets obtained in exchange for operating lease liabilities | $ 38,527 | $ 114,900 |

97.    Additionally, underneath the table, the Q1 2023 10-Q stated that "Rental expense for operating leases for the three months ended March 31, 2023 and 2022 was $77.4 million and $65.1 million, respectively, of which $76.4 million and $63.6 million, respectively, is recognized in cost of revenues, $0.2 million and $0.7 million respectively, in operations and support, and $0.8 million and $0.8 million, respectively, in general and administrative."

98.    At no point did the Q1 2023 10-Q disclose any impairment charges.

99.    Further, in discussing the Company's internal controls over leases, the Q1 2023 10-Q offered the same disclosure as was disclosed in the 2022 10-K.

100.    In reporting on changes in internal control over financial reporting, the Q1 2023 10-Q stated that "[o]ther than the remediation efforts in progress, during the period covered by this report, ***there has been no change in our internal control over financial reporting that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting***."

### August 9, 2023 Form 10-Q

101.    On August 9, 2023, the Company filed the its quarterly report on Form 10-Q with the SEC for the second quarter of the 2023 Fiscal Year (the "Q2 2023 10-Q"). The Q2 2023 10-Q was signed by Defendant Berry and attached SOX certifications signed by Defendants Davidson and Bourgault attesting to the accuracy of the Q2 2023 10-Q and that "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the [Company] as of, and for, the periods presented in this report."

102.    The Q2 2023 10-Q contained a consolidated balance sheet that showed the value of the Company's "Operating lease right-of-use ("ROU") assets as $1,308,719,000 for the second quarter of the 2023 Fiscal Year. In full, the balance sheet in the Q2 2023 10-Q showed the following assets and liabilities (in thousands):

Verified Shareholder Derivative Complaint

|  | June 30, 2023 | December 31, 2022 |
|---|---|---|
| **Assets** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 177,444 | $ 246,624 |
| Restricted cash | 42,069 | 42,562 |
| Accounts receivable, net of allowance of $1,461 and $972 at June 30, 2023 and December 31, 2022, respectively | 14,042 | 5,613 |
| Prepaid expenses | 8,786 | 8,066 |
| Other current assets | 11,516 | 10,065 |
| Total current assets | 253,857 | 312,930 |
| Property and equipment, net | 31,616 | 34,926 |
| Operating lease right-of-use ("ROU") assets | 1,308,719 | 1,209,486 |
| Other non-current assets | 13,667 | 16,270 |
| Total assets | $ 1,607,859 | $ 1,573,612 |
| | | |
| **Liabilities and stockholders' deficit** | | |
| Current liabilities: | | |
| Accounts payable | $ 19,878 | $ 16,082 |
| Accrued liabilities | 18,555 | 20,131 |
| Taxes payable | 15,476 | 14,418 |
| Deferred revenue | 59,858 | 41,664 |
| | | |
| Current operating lease liabilities | 183,487 | 158,346 |

Verified Shareholder Derivative Complaint

| | | |
|---|---|---|
| Total current liabilities | 297,254 | 250,641 |
| Non-current operating lease liabilities | 1,259,207 | 1,166,538 |
| Long-term debt, net | 186,884 | 172,950 |
| Other non-current liabilities | 1,106 | 3,430 |
| Total liabilities | 1,744,451 | 1,593,559 |

103.  A note in the Q2 2023 10-Q later broke down how the Company accounted for its leases. The note stated:

> Operating lease ROU assets are included within operating lease right- of-use assets in the condensed consolidated balance sheets. The corresponding operating lease liabilities are included within current operating lease liabilities and non-current operating lease liabilities in the condensed consolidated balance sheets. ROU assets represent the Company's right to use an underlying asset for the lease term and lease liabilities represent the Company's obligation to make lease payments arising from the lease.

> Lease expense for fixed operating lease payments is recognized on a straight-line basis over the lease term. The Company's lease terms may include options to extend or terminate the lease when it is reasonably certain that it will exercise that option.

104.  The note then broke down the components of the Company's operating leases, with the tables showing (in thousands):

Verified Shareholder Derivative Complaint

|  | Three months ended June 30, | | Six months ended June 30, | |
|---|---|---|---|---|
|  | 2023 | 2022 | 2023 | 2022 |
| Operating lease cost | $ 74,579 | $ 65,876 | $ 149,838 | $ 128,823 |
| Short-term lease cost | (201) | 477 | 431 | 479 |
| Variable lease cost | 371 | 944 | 1,872 | 1,587 |
| Total operating lease cost | $ 74,749 | $ 67,297 | $ 152,141 | $ 130,889 |

Supplemental information related to operating leases was as follows (in thousands):

|  | Three months ended June 30, | | Six months ended June 30, | |
|---|---|---|---|---|
|  | 2023 | 2022 | 2023 | 2022 |
| Cash payments for operating leases | $ 74,958 | $ 56,838 | $ 143,173 | $ 106,603 |
| New operating lease ROU assets obtained in exchange for operating lease liabilities | $ 148,510 | $ 11,968 | $ 187,037 | $ 126,868 |

105.   Additionally, underneath the table, the Q2 2023 10-Q summarize the total operating lease cost for both the second quarter, and first half of the 2023 Fiscal Year, stating:

> Total operating lease cost for the three months ended June 30, 2023 and 2022 was $74.7 million and $67.2 million, respectively, of which $74.3 million and $64.5 million, respectively, is recognized in cost of revenues, $0.2 million and $0.2 million, respectively, in operations and support, and $0.2 million and $1.1 million, respectively, in general and administrative in the condensed consolidated statements of operations and comprehensive loss.

> Total operating lease cost for the six months ended June 30, 2023 and 2022 was $152.1 million and $130.9 million, respectively, of which $150.6 million and $128.1 million, respectively, is recognized in cost of revenues, $0.4 million and $0.9 million respectively, in operations and support, and $1.1 million and $1.9 million, respectively, in general and administrative in the condensed consolidated statements of operations and comprehensive loss.

106.   At no point did the Q2 2023 10-Q disclose any impairment charges.

107.    Further, in discussing the Company's internal controls over leases, the Q2 2023 10-Q offered the same disclosure as was disclosed in the 2022 10-K and Q1 2023 10-Q.

108.    Similarly, in reporting on changes in internal control over financial reporting, the Q2 2023 10-Q uses the same disclosure as was used in the Q1 2023 10-Q.

### *November 14, 2023 Form 10-Q*

109.    On November 14, 2023, the Company filed the its quarterly report on Form 10-Q with the SEC for the third quarter of the 2023 Fiscal Year (the "Q3 2023 10-Q"). The Q3 2023 10-Q was signed by Defendant Bourgault and attached SOX certifications signed by Defendants Davidson and Bourgault attesting to the accuracy of the Q3 2023 10-Q and that "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the [Company] as of, and for, the periods presented in this report."

110.    The Q3 2023 10-Q contained a consolidated balance sheet that showed the value of the Company's "Operating lease right-of-use ("ROU") assets as $1,439,572,000 for the second quarter of the 2023 Fiscal Year. In full, the balance sheet in the Q2 2023 10-Q showed the following assets and liabilities (in thousands):

Verified Shareholder Derivative Complaint

|  | September 30, 2023 | December 31, 2022 |
|---|---|---|
| **Assets** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 166,045 | $ 246,624 |
| Restricted cash | 41,188 | 42,562 |
| Accounts receivable, net of allowance of $3,265 and $972 at September 30, 2023 and December 31, 2022, respectively | 9,105 | 5,613 |
| Prepaid expenses | 6,388 | 8,066 |
| Other current assets | 10,532 | 10,065 |
| Total current assets | 233,258 | 312,930 |
| Property and equipment, net | 28,462 | 34,926 |
| Operating lease right-of-use ("ROU") assets | 1,439,572 | 1,209,486 |
| Other non-current assets | 15,045 | 16,270 |
| Total assets | $ 1,716,337 | $ 1,573,612 |
| | | |
| **Liabilities and stockholders' deficit** | | |
| Current liabilities: | | |
| Accounts payable | $ 20,514 | $ 16,082 |
| Accrued liabilities | 24,694 | 20,131 |
| Taxes payable | 15,894 | 14,418 |
| Deferred revenue | 67,819 | 41,664 |
| Current portion of long-term debt | 1,000 | — |
| Current operating lease liabilities | 199,345 | 158,346 |
| Total current liabilities | 329,266 | 250,641 |
| Non-current operating lease liabilities | 1,382,693 | 1,166,538 |
| Long-term debt, net | 196,398 | 172,950 |
| Other non-current liabilities | 668 | 3,430 |
| Total liabilities | 1,909,025 | 1,593,559 |

Verified Shareholder Derivative Complaint

111.  The Q3 2023 10-Q also held a table showing the unaudited consolidated cash flow statements for the Company, which showed that in the first three quarters of the 2023 Fiscal Year, the Company's "Operating lease ROU assets and operating lease liabilities, net" showed a net loss of $105,422,000. In full, the cash flow statement in the Q3 2023 10-Q stated:

|  | Nine months ended September 30, | |
|  | 2023 | 2022 |
| --- | --- | --- |
| **Cash flows from operating activities:** | | |
| Net loss | $  (196,034) | $  (108,392) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | |
| Depreciation and amortization | 18,908 | 17,801 |
| Stock-based compensation | 25,362 | 18,139 |
| Amortization of operating lease ROU assets | 130,192 | 105,569 |
| Impairment of ROU assets | 1,087 | — |
| (Gain) loss on foreign exchange | (2,445) | 13,092 |
| Capitalization of paid-in-kind interest on long-term debt | 20,418 | 12,544 |

Verified Shareholder Derivative Complaint

| | | |
|---|---:|---:|
| Amortization of debt issuance costs | 6 | 149 |
| Amortization of debt discounts | 1,274 | 3,374 |
| Change in fair value of share-settled redemption feature and gain on conversion of convertible notes | — | (29,512) |
| Change in fair value of SPAC Warrants | (674) | (23,819) |
| Change in fair value of Earn Out Liability | (2,142) | (94,299) |
| Other operating activities | 897 | 1,362 |
| Changes in: | | |
| Accounts receivable, net | (4,817) | (1,560) |
| Prepaid expenses | 1,885 | (2,543) |
| Other current and non-current assets | 1,177 | 10,750 |
| Accounts payable | 4,433 | (28,401) |
| Accrued liabilities | 3,911 | 2,295 |
| Taxes payable | 1,706 | 6,181 |
| Deferred revenue | 25,651 | 30,204 |
| Operating lease ROU assets and operating lease liabilities, net | (105,422) | (58,493) |
| Other current and non-current liabilities | 589 | 1,467 |
| Net cash used in operating activities | (74,038) | (124,092) |

112.    A note in the Q3 2023 10-Q later broke down how the Company accounted
for its leases. The note stated:

> Operating lease ROU assets are included within operating lease right- of-use
> assets in the condensed consolidated balance sheets. The corresponding
> operating lease liabilities are included within current operating lease liabilities
> and non-current operating lease liabilities in the condensed consolidated
> balance sheets. ROU assets represent the Company's right to use an
> underlying asset for the lease term and lease liabilities represent the
> Company's obligation to make lease payments arising from the lease.
>
> Lease expense for fixed operating lease payments is recognized on a straight-
> line basis over the lease term. The Company's lease terms may include options
> to extend or terminate the lease when it is reasonably certain that it will
> exercise that option.

113.    The note then broke down the components of the Company's operating leases, with the tables showing (in thousands):

| | Three months ended September 30, | | | Nine months ended September 30, | | |
|---|---|---|---|---|---|---|
| | 2023 | | 2022 | 2023 | | 2022 |
| Operating lease cost | $ 85,025 | $ | 61,498 | $ 234,801 | $ | 191,908 |
| Short-term lease cost | 343 | | 1,951 | 780 | | 2,430 |
| Variable lease cost | 6,356 | | — | 9,425 | | — |
| Total operating lease cost | $ 91,724 | $ | 63,449 | $ 245,006 | $ | 194,338 |

Supplemental information related to operating leases was as follows (in thousands):

| | Three months ended September 30, | | | Nine months ended September 30, | | |
|---|---|---|---|---|---|---|
| | 2023 | | 2022 | 2023 | | 2022 |
| Cash payments for operating leases | $ 73,777 | $ | 64,690 | $ 216,950 | $ | 171,292 |
| New operating lease ROU assets obtained in exchange for operating lease liabilities | $ 173,781 | $ | 73,007 | $ 360,818 | $ | 199,875 |

114.    Additionally, underneath the table, the Q3 2023 10-Q summarize the total operating lease cost for both the third quarter, and first three quarters (collectively) of the 2023 Fiscal Year, stating:

> Total operating lease cost for the three months ended September 30, 2023 and 2022 was $91.7 million and $63.4 million, respectively, of which $91.2 million and $62.0 million, respectively, is recognized in cost of revenues, $0.2 million and $0.5 million, respectively, in operations and support, and $0.3 million and $0.9 million, respectively, in general and administrative in the condensed consolidated statements of operations and comprehensive loss.

> Total operating lease cost for the nine months ended September 30, 2023 and 2022 was $245.0 million and $194.3 million, respectively, of which $243.0 million and $190.1 million, respectively, is recognized in cost of revenues, $0.6 million and $1.4 million respectively, in operations and support, and $1.4

million and $2.8 million, respectively, in general and administrative in the condensed consolidated statements of operations and comprehensive loss.

115.    The Q3 2023 10-Q also identified an impairment cost, stating that "[a]s of September 30, 2023, the Company identified an impairment of its operating lease right of use (ROU) asset and recorded a related impairment charge in the amount of $1.1 million. The impairment charge is included within other operating expenses for the three and nine months ended September 30, 2023 as reported in the condensed consolidated statements of operations."

116.    Further, in discussing the Company's internal controls over leases, the Q3 2023 10-Q offered the same disclosure as was disclosed in the 2022 10-K and Q1 and Q2 2023 10-Qs.

117.    Similarly, in reporting on changes in internal control over financial reporting, the Q3 2023 10-Q uses the same disclosure as was used in the Q1 and Q2 2023 10-Qs.

118.    The statements in ¶¶79-85 and ¶¶93-117 above were materially false and misleading and failed to disclose, *inter alia*, that, with regard to the Company's financial statements issued during the Relevant Period, Defendants knew and/or recklessly disregarded that Sonder had improperly accounted for, *inter alia*, the valuation and impairment of its operating lease ROU assets. As a result of the foregoing, the Company's statements about its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

**<u>The Truth Emerges</u>**

119.    On March 15, 2024, the truth emerged when, after market hours, the Company issued a press release on Form 8-K revealing that the Company's audited financial statements for the 2022 10-K, and unaudited consolidated financial statements in the 2023 quarterly reports, could no longer be relied upon as the result of "accounting errors related to the valuation and impairment of operating lease ROU assets and related items."

120. The press release further revealed the Company's previously identified weaknesses in internal controls as having an impact, stating:

> The Company has previously identified and reported material weaknesses in internal controls over financial reporting related to the Company's leases, control activities and control environment. During the on-going preparation of the Company's financial statements for the fiscal year ended December 31, 2023, the Company's management identified specific errors in the processes and procedures surrounding the Company's assessment of the valuation and impairment of its ROU lease assets and related items. Upon additional review, the Company's management determined that the valuation of certain ROU lease assets and related items as of and for each of the Non-Reliance Periods had not considered certain relevant impairment indicators and related valuation information impacting the carrying value of such assets and related items, as required by Accounting Standards Codification (ASC) Nos. 842, Leases, and 360, Property, Plant, and Equipment, in addition to related standards and interpretations.

121. Additionally, the press release touched upon the impairment charge from the Q3 2023 10-Q's impact on the issues, stating:

> The Company previously recorded an impairment charge in the amount of $1.1 million related to ROU lease assets in its unaudited condensed consolidated financial statements for the three and nine months ended September 30, 2023, but no impairment charges were recorded in the other interim financial statements in the Non-Reliance Periods or in the 2022 Annual Financial Statements. Based on the Company's review, which is ongoing, the Company expects to record material non-cash impairment charges, and related reductions in ROU lease assets and related items, in certain of the Non-Reliance Periods.

> The foregoing ROU lease asset and related item errors are non-cash in nature and will not impact the Company's reported cash balances or statements of cash flows for the Non-Reliance Periods. ***The Company expects that the restatements will increase the Company's overall net loss and loss per share in the impacted periods***.

122. The press release continued, discussing the Company's intent to issue corrected financial statements, and the impact this will have on the Company's pending annual report for the 2023 Fiscal Year, stating:

The Company intends to restate the Affected Financial Statements to correct the errors discussed above, and consider any other error corrections identified in the course of its review, as soon as practicable. Investors and others should rely on financial information and other disclosures regarding the Non-Reliance Periods only after the Company restates its financial statements for the Non-Reliance Periods.

The Company anticipates that it will not timely file its Annual Report on Form 10-K for the fiscal year ended December 31, 2023 (the "FY 2023 10-K") and will file a notification of late filing on Form 12b-25 with the SEC. The Company does not currently expect that it will file the FY 2023 10-K within the 15-day extension period contemplated by Rule 12b-25(b) under the Securities Exchange Act of 1934, as amended. Accordingly, the Company expects to receive a notice from The Nasdaq Stock Market that it is not in compliance with the timely filing requirement for continued listing under Nasdaq Listing Rule 5250(c)(1).

123.    The press release went on to reveal an anticipated material weakness that will be revealed, a matter that set to be discussed with the Company's independent auditor, with the press release stating:

Although the assessment is not yet complete, the Company anticipates that the review will result in one or more material weaknesses in the Company's internal control over financial reporting during the applicable periods, in addition to the Company's previously identified and reported material weaknesses.

The Company's management and the Audit Committee have discussed the foregoing matters with the Company's independent registered public accounting firm, Deloitte & Touche LLP.

124.    Continuing, the press release revealed the anticipated negative effect the restatement would have on the Company's debt, stating:

***The Company's restatement and the related items discussed in this Form 8-K could have an adverse effect upon the Company's debt, including under the Loan and Security Agreement dated as of December 21, 2022, as amended, with Silicon Valley Bank, a division of First Citizens Bank & Trust Company, and the Note and Warrant Purchase Agreement dated as of December 10, 2021, as amended, with certain private placement investors***. The Company is engaging in discussions with its lenders to seek waivers of any noncompliance under the terms of its debt resulting from the

accounting errors and to permit the late filing of the FY 2023 10-K. *If such waivers are not obtained, any such noncompliance may entitle our lenders to terminate any existing commitments to lend, impose increased interest rates, accelerate our outstanding debt obligations, initiate foreclosure proceedings against any assets constituting collateral for such obligations and exercise other rights and remedies available under the terms of our debt agreements. If our debt were to be accelerated, the Company may not have sufficient cash or be able to borrow sufficient funds to refinance the debt or sell sufficient assets to repay the debt, which could immediately adversely affect our business, cash flows, results of operations and financial condition*. Even if we were able to obtain new financing or negotiate amended terms with our existing lenders, such financing or amendments may not be on commercially reasonable terms or on terms that are acceptable to us.

125. The press release concluded with a summary of the Company's total cash and cash equivalents as of the end of the 2023 Fiscal Year, stating:

As of December 31, 2023, the Company's total cash, cash equivalents and restricted cash was $136.5 million, of which $40.7 million was restricted, as compared to $207.2 million, of which $41.2 million was restricted, as of September 30, 2023. As communicated in prior disclosures, the Company has been executing on a number of initiatives to improve its financial position, including reducing its corporate headcount by 38% since the first quarter of 2022, and engaging in a portfolio optimization program to improve the financial performance of the properties it operates. The Company is also exploring a number of additional opportunities to improve revenue by enhancing its distribution arrangements, further reduce its expenditures, and partner with current or alternative capital providers to improve its liquidity position, but can give no assurances that these alternatives will be successful. *If these alternatives are not successful, the Company may not be able to continue ongoing operations or meet its obligations without favorable liquidity options or additional funding*.

126. That same day, the Company issued a Notification of Late Filing on Form 12b-25 with the SEC, which stated, *inter alia*:

Sonder Holdings Inc. (the "Company") is unable to file its Annual Report on Form 10-K for the year ended December 31, 2023 (the "Form 10-K") within the prescribed time period, without unreasonable effort or expense. As disclosed in the Company's Current Report on Form 8-K dated March 15, 2024, which is hereby incorporated by reference, on March 14, 2024, the Audit Committee of the Board of Directors of the Company determined, based on management's recommendation, that the Company's audited consolidated

financial statements for the year ended December 31, 2022, and the unaudited condensed consolidated financial statements included in each of the Company's quarterly reports on Form 10-Q filed with the Securities and Exchange Commission in 2023, should no longer be relied upon due to accounting errors related to the valuation and impairment of operating lease right of use assets and related items. The Company intends to restate the affected financial statements to correct the errors and any other errors identified in the course of its review, as soon as practicable. The Company's management is also assessing the effect of these matters on the Company's internal control over financial reporting and its disclosure controls and procedures. The Company requires additional time to complete the foregoing restatements and control assessments and to finalize its fiscal year 2023 financial statements for inclusion in the Form 10-K. The Company does not expect to file the Form 10-K within the 15-day extension period prescribed by Rule 12b-25 under the Securities Exchange Act of 1934, as amended.

The description above is preliminary and subject to change in connection with the Company's ongoing review and the completion of the anticipated restatements. Accordingly, there can be no assurance as to the timing of the filing of the Form 10-K or the results of the Company's ongoing review.

127.    On this news, the price of the Company's stock fell $2.10 per share, or approximately 38.2%, from a close of $5.50 per share on March 17, 2024, to close at $3.40 per share on March 18, 2024.

## SUBSEQUENT DEVELOPMENTS

128.    On August 22, 2024, the Company announced that its Chief Operating Officer, Deeksha Hebbar, would be resigning, effective August 31, 2024.

129.    The Company finally filed its annual report for the 2023 Fiscal Year on Form 10-K on September 27, 2024 (the "2023 10-K"). The 2023 10-K discussed the revelations from the press release on March 15, 2024, stating:

As described in the Company's Current Report on Form 8-K filed with the SEC on March 15, 2024, on March 14, 2024, the Audit Committee (the "Audit Committee") of the Board of Directors of the Company determined, based on management's recommendation, that the Company's previously issued audited consolidated financial statements for the year ended December 31, 2022 (the "2022 Annual Financial Statements"), and the unaudited condensed consolidated financial statements included in each of the Company's quarterly

reports on Form 10-Q filed with the SEC in 2023 (collectively with the 2022 Annual Financial Statements, the "Affected Financial Statements"), should no longer be relied upon.

Additionally, the Company determined any previously issued or filed reports, earnings releases, and investor presentations or other communications including or describing the Affected Financial Statements and related financial information covering the Affected Financial Statements should no longer be relied upon.

The Company has previously identified and reported material weaknesses in internal controls over financial reporting related to the Company's leases, control activities and control environment. During the preparation of the Company's financial statements for the year ended December 31, 2023, the Company's management identified specific errors in the processes and procedures surrounding the Company's assessment of the valuation and impairment of its right-of- use ("ROU") lease assets and related items. Management identified a material weakness in its controls related to this matter, which is included in Part II, Item 9A of this Annual Report on Form 10-K.

**Restatement of Previously Issued Consolidated Financial Statements**

This Annual Report on Form 10-K for the year ended December 31, 2023 includes consolidated financial statements as of and for the years ended December 31, 2023, 2022 and 2021, as well as the relevant unaudited interim financial information for the quarterly periods in the years ended December 31, 2023 and 2022. The Company has restated certain information within this Annual Report on Form 10-K, including the consolidated financial statements as of and for the year ended December 31, 2022, and the relevant unaudited interim financial information for the quarterly periods in 2022 and 2023. In addition to the restatement errors described above, the Company has also corrected certain items that were previously identified and determined to be immaterial, individually and in the aggregate, to the consolidated financial statements for the year ended December 31, 2022 and the interim financial information for the quarterly periods in 2022 and 2023.

Additionally, the Company identified certain adjustments which were previously corrected out of period in the year ended December 31, 2022 but which related to activity occurring in the year ended December 31, 2021. In the context of its current restatement of the year ended December 31, 2022,

the Company has also restated the year ended December 31, 2021 to reflect correction for these adjustments and has marked the impacted financial statements for the year ended December 31, 2021 as 'Restated' to highlight the correction of these immaterial errors. The Company considers its restatement to the year ended December 31, 2021 to be immaterial as defined in Accounting Standards Codification ("ASC") 250, Accounting Changes and Error Corrections, and related standards and interpretations.

130.   On November 4, 2024, the Company issued a press release on Form 8-K that Defendant Bourgault would be resigning as the Company's CFO on December 2, 2024. Additionally, the Company also announced that Adam Bowen, its Chief Accounting Officer, would also be resigning on December 31, 2024.

## DAMAGES TO SONDER

131.   As a direct and proximate result of the Individual Defendants' conduct, Sonder has lost and will continue to lose and expend many millions of dollars.

132.   Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

133.   Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on the misconduct alleged herein, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

134.   Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

135.   Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

136.   As a direct and proximate result of the Individual Defendants' conduct, Sonder has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations.

## DERIVATIVE ALLEGATIONS

137.   Plaintiff brings this action derivatively and for the benefit of Sonder to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Sonder, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, violations of Section 14(a) of the Exchange Act, as well as for contribution under Sections 10(b) and 21D of the Exchange Act against Defendants Davidson, Berry, and Bourgault.

138.   Sonder is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

139.   Plaintiff is, and has been at all relevant times, a shareholder of Sonder. Plaintiff will adequately and fairly represent the interests of Sonder in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

140.   Plaintiff incorporates by reference and realleges each and every allegation stated above as if fully set forth herein.

141.   A pre-suit demand on the Board is futile and, therefore, excused. When this action was filed, Sonder's Board consisted of the following eight individuals: Defendants Davidson, Aggarwal, Banker, Frymire, Sears, and van Paasschen (the "Director-Defendants"), and non-parties Simon Turner and Erin Wallace (collectively, with the Director-Defendants, the "Directors"). Plaintiff needs only to allege demand futility as to four of the eight Directors that were on the Board at the time this action was filed.

142.   Demand is excused as to all of the Director-Defendants because each one of

them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material fact, which renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

143.    Moreover, all of the Director-Defendants solicited the false and misleading 2023 Proxy Statement to call for a shareholder vote to, *inter alia*, re-elect Defendants Perez-Alvarado and Frymire to the Board for a three-year term, thereby allowing them to continue breaching their fiduciary duties to the Company.

144.    In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly caused or permitted Sonder to issue materially false and misleading statements. Specifically, the Director-Defendants caused Sonder to issue false and misleading statements which were intended to make Sonder appear more profitable and attractive to investors. Moreover, the Director-Defendants caused the Company to fail to maintain internal controls. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

145.    Additional reasons that demand on Defendant Davidson is futile follow. Defendant Davidson has served as a director and CEO of Sonder since founding the Company in January 2014. Previously, he also served as the Chair of Company's Board until December 2024. The Company provides Defendant Davidson with his principal occupation, for which he receives handsome compensation. Thus, as the Company admits, he is a non-independent director. As the Company's highest officer and an influential member of the Board, Defendant Davidson signed the false and misleading 2022 10-K, as well as SOX certifications for all of the false and misleading statements made during the Relevant Period. Defendant Davidson also solicited the 2023 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants

Perez-Alvarado and Frymire to the Board for a three-year term, thereby allowing them to continue breaching their fiduciary duties to the Company. As the Company's highest officer, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, during the Relevant Period, he failed to correct the false and misleading statements alleged herein. Moreover, Defendant Davidson is named as a defendant in the Securities Class Action. For these reasons, Defendant Davidson breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

146.    Additional reasons that demand on Defendant Aggarwal is futile follow. Defendant Aggarwal has served as a Company director since 2022. He also serves as the Chair of the Nominating, Corporate Governance, and Social Responsibility Committee and as a member of the Compensation Committee. Defendant Aggarwal has received and continues to receive handsome compensation for his role as a director. As a Company director, Defendant Aggarwal also signed the false and misleading 2022 10-K. Defendant Aggarwal also solicited the 2023 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Perez-Alvarado and Frymire to the Board for a three-year term, thereby allowing them to continue breaching their fiduciary duties to the Company. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons too, Defendant Aggarwal breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and therefore, excused.

147.    Additional reasons that demand on Defendant Banker is futile follow.

Defendant Banker has served as a Company director since January 2023. He also serves as a member of the Investment Committee. Previously, he served as the Company's CFO from January 2019 until December 2022, and also as the Company's President from September 2020 until December 2022. Thus, as the Company admits, he is not an independent director. Defendant Banker has received and continues to receive handsome compensation for his role as a director. As a Company director, Defendant Banker also signed the false and misleading 2022 10-K. Defendant Banker also solicited the 2023 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Perez-Alvarado and Frymire to the Board for a three-year term, thereby allowing them to continue breaching their fiduciary duties to the Company. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons too, Defendant Banker breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and therefore, excused.

148. Additional reasons that demand on Defendant Frymire is futile follow. Defendant Frymire has served as a Company director since 2022. She also serves as the Chair of the Investment Committee and as a member of the Nominating, Corporate Governance, and Social Responsibility Committee. Defendant Frymire previously served on the Audit Committee during the Relevant Period. Defendant Frymire has received and continues to receive handsome compensation for his role as a director. As a Company director, Defendant Frymire also signed the false and misleading 2022 10-K. Defendant Frymire also solicited the 2023 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendant Perez-Alvarado and herself to the Board for a three-year term, thereby allowing them to continue breaching their fiduciary duties to the Company. As a trusted Company director, she conducted little, if any,

oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons too, Defendant Frymire breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and therefore, excused.

149. Additional reasons that demand on Defendant Sears is futile follow. Defendant Sears has served as a Company director since 2021, and as the Chairperson of the Board since January 2025. Previously, she served as the Lead Independent Director. She also serves as a Chair of the Audit Committee and as a member of the Compensation Committee. Defendant Sears has received and continues to receive handsome compensation for her role as a director. As a Company director, Defendant Sears also signed the false and misleading 2022 10-K. Defendant Sears also solicited the 2023 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Perez-Alvarado and Frymire to the Board for a three-year term, thereby allowing them to continue breaching their fiduciary duties to the Company. As the trusted Company Chairperson, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons too, Defendant Sears breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and therefore, excused.

150. Additional reasons that demand on Defendant van Paasschen is futile follow. Defendant van Paasschen has served as a Company director since 2020. He also serves as a member of the Audit Committee and Investment Committee. Defendant van Paasschen has received and continues to receive handsome compensation for his role as a director. As a Company director, Defendant van Paasschen also signed the false and misleading 2022

10-K. Defendant van Paasschen solicited the 2023 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Perez-Alvarado and Frymire to the Board for a three-year term, thereby allowing them to continue breaching their fiduciary duties to the Company. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons too, Defendant van Paasschen breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and therefore, excused.

151.    Additional reasons that demand on the Board is futile follow.

152.    Defendants Sears (as Chair), Frymire, and van Paasschen (collectively, the "Audit Committee Defendants") served as members of the Audit Committee at all relevant times. As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and regulations. During the Relevant Period, they violated the Audit Committee Charter by engaging in or permitting the Company to engage in the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Exchange Act; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and the Code of Conduct. Thus, the Audit Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

153.    In violation of the Code of Conduct, the Director-Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise

the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In further violation of the Code of Conduct, the Director-Defendants failed to comply with laws and regulations, maintain the accuracy of Company records and reports, avoid conflicts of interest, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

154. Sonder has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or any others who were responsible for that wrongful conduct to attempt to recover for Sonder any part of the damages Sonder suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

155. The Director-Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

156. The acts complained of herein constitute violations of fiduciary duties owed by Sonder's officers and directors, and these acts are incapable of ratification.

157. The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Sonder. If

there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of Sonder, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

158.    If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Sonder to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

159.    Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least four of the Director-Defendants, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

### FIRST CLAIM
### Against the Individual Defendants for Violations of
### Section 14(a) of the Exchange Act

160.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

161.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit

Verified Shareholder Derivative Complaint

the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

162.   Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

163.   Defendants Davidson, Aggarwal, Banker, Frymire, Hyatt, Perez-Alvarado, Sears, and van Paasschen caused the 2023 Proxy Statement to be false and misleading by failing to disclose, *inter alia*, that, with regard to the Company's financial statements issued during the Relevant Period, Defendants knew and/or recklessly disregarded that Sonder had improperly accounted for, *inter alia*, the valuation and impairment of its operating lease ROU assets. As a result of the foregoing, the Company's statements about its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

164.   Under the direction and watch of Defendants Davidson, Aggarwal, Banker, Frymire, Hyatt, Perez-Alvarado, Sears, and van Paasschen, the 2023 Proxy Statement also failed to disclose, *inter alia*, that: (1) though the Company claimed its officers and directors adhered to the Code of Conduct, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2023 Proxy Statement's description of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

165.   In the exercise of reasonable care, the Individual Defendants should have known that, by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2023 Proxy Statement were materially false and misleading.

The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2023 Proxy Statement, including, but not limited to, the reelection of the Company's directors.

166.   As a result of Defendants Davidson, Aggarwal, Banker, Frymire, Hyatt, Perez-Alvarado, Sears, and van Paasschen causing the 2023 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to: (1) re-elect Defendants Perez-Alvarado and Frymire to the Board for a three-year term, thereby allowing them to continue breaching their fiduciary duties to the Company; and (2) ratify the selection of Deloitte & Touche LLP as the Company's independent registered public accounting firm for the 2023 Fiscal Year.

167.   The Company was damaged as a result of Defendants Davidson's, Aggarwal's, Banker's, Frymire's, Hyatt's, Perez-Alvarado's, Sears's, and van Paasschen's material misrepresentations and omissions in the 2023 Proxy Statement.

168.   Plaintiff, on behalf of Sonder, has no adequate remedy at law.

### SECOND CLAIM
**Against the Individual Defendants for Breach of Fiduciary Duties**

169.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

170.   Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Sonder's business and affairs.

171.   Each of the Individual Defendants violated and breached their fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

172.   The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Sonder.

173.   In breach of their fiduciary duties owed to Sonder, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that, with regard to the Company's financial statements issued during the Relevant Period, Defendants knew and/or recklessly disregarded that Sonder had improperly accounted for, *inter alia*, the valuation and impairment of its operating lease ROU assets. As a result of the foregoing, the Company's statements about its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

174.   In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact referenced herein, which renders them personally liable to the Company for breaching their fiduciary duties.

175.   Also, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain internal controls.

176.   The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Sonder's securities.

177.   The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they

caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Sonder's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

178.   These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

179.   As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Sonder has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

180.   Plaintiff, on behalf of Sonder, has no adequate remedy at law.

**THIRD CLAIM**
**Against the Individual Defendants for Unjust Enrichment**

181.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

182.   By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Sonder.

183.   The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Sonder that was tied to the performance or artificially inflated valuation of Sonder, or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct. This includes lavish compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

184.   Plaintiff, as a shareholder and a representative of Sonder, seeks restitution

from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

185.   Plaintiff, on behalf of Sonder, has no adequate remedy at law.

## FOURTH CLAIM
### Against the Individual Defendants for Abuse of Control

186.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

187.   The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Sonder, for which they are legally responsible.

188.   As a direct and proximate result of the Individual Defendants' abuse of control, Sonder has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

189.   Plaintiff, on behalf of Sonder, has no adequate remedy at law.

## FIFTH CLAIM
### Against the Individual Defendants for Gross Mismanagement

190.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

191.   By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Sonder in a manner consistent with the operations of a publicly held corporation.

192.   As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Sonder has sustained and will continue to sustain significant damages.

Verified Shareholder Derivative Complaint

193.   As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

194.   Plaintiff, on behalf of Sonder, has no adequate remedy at law.

## SIXTH CLAIM
### Against the Individual Defendants for Waste of Corporate Assets

195.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

196.   The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees, to the detriment of the shareholders and the Company.

197.   As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Sonder to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

198.   As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

199.   Plaintiff, on behalf of Sonder, has no adequate remedy at law.

## SEVENTH CLAIM
### Against Defendants Davidson, Berry, and Bourgault for Contribution Under Sections 10(b) and 21D of the Exchange Act

200.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

201.   Sonder and Defendants Davidson, Berry, and Bourgault are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class

Verified Shareholder Derivative Complaint

Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendant Davidson's, Defendant Berry's, and Defendant Bourgault's willful and/or reckless violations of their obligations as officers and/or directors of the Company.

202.    Defendants Davidson, Berry, and Bourgault, because of their positions of control and authority as officers and/or directors of the Company, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of the Company, including the wrongful acts complained of herein and in the Securities Class Action.

203.    Accordingly, Defendants Davidson, Berry, and Bourgault are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

204.    As such, Sonder is entitled to receive all appropriate contribution or indemnification from Defendants Davidson, Berry, and Bourgault.

## **PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Sonder, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Sonder;

(c)    Determining and awarding to Sonder the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing Sonder and the Individual Defendants to take all necessary actions to reform and improve Sonder's corporate governance and internal procedures to

comply with applicable laws and to protect Sonder and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws and/or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of Sonder to nominate at least four candidates for election to the Board;

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

(e)    Awarding Sonder restitution from Individual Defendants, and each of them;

(f)    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

///
///
///
///
///
///
///
///
///
///

Verified Shareholder Derivative Complaint

(g)    Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: January 28, 2025                    Respectfully submitted,

                                           **THE BROWN LAW FIRM, P.C.**

                                           */s/  Robert C. Moest*
                                           Robert C. Moest, Of Counsel, SBN 62166
                                           2530 Wilshire Boulevard, Second Floor
                                           Santa Monica, CA 90403
                                           Telephone: (310) 915-6628
                                           Facsimile: (310) 915-9897
                                           Email: RMoest@aol.com

                                           *Attorneys for Plaintiff*

Verified Shareholder Derivative Complaint

Docusign Envelope ID: 9C83C48D-20F4-4DFF-95A0-EFEDD2069185

## VERIFICATION

I, Alexander Versen, am a plaintiff in the within action. I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 27 day of January, 2025.

Signed by:

*Alexander Versen*

4AC32FABD8A14CB...

Alexander Versen